**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| RANDALL RADER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | JURY DEMAND |
| ELECTRONIC PAYMENT SYSTEMS, LLC | ) | |
| | ) | |
| Defendant, | ) | |

## COMPLAINT AT LAW

Plaintiff, RANDALL RADER ("Rader") by his attorney, STEVEN FUOCO of FUOCO LAW GROUP, LTD and complaining of defendant, ELECTRONIC PAYMENT SYSTEMS, LLC ("EPS") pleading hypothetically and in the alternative, states as follows:

## NATURE OF ACTION

1.     This action seeks treble money damages and prevailing party attorney fees and costs for EPS' violation of Colo. Rev. Stat. § 12-66-101 *et seq.* ("Wholesale Sales Representatives Act" or "Act") when failing to pay Rader his sales compensation and residual income due, pursuant to the written Marketing Agreement ("Agreement") between the parties.

2.     This action also alleges state common law claims premised upon EPS' intentional interference with prospective business relations, breach of express Agreement terms, breach of the Agreement implied covenant of good faith and fair dealing, and seeks equitable relief from unjust enrichment. Prejudgment interest is mandated by Colo. Rev. Stat. § 13-21-101(1).

## JURISDICTION AND VENUE

3.     Rader is a citizen of Ohio.

1

4.      EPS is a Colorado corporation headquartered in Englewood.

5.      The Agreement attached as Exhibit A required Rader to expressly consent to Colorado state or federal court jurisdiction and venue as part of the Agreement for all suits initiated by either Rader or EPS.

6.      Rader's residual income unpaid by EPS after February 1, 2010 to the present time in controversy exceeds $75,000.00.

7.      This Court has proper jurisdiction based upon 28 U.S.C. § 1332 diversity of citizenship.

8.      Venue is proper based upon the Agreement venue provision and the Englewood, Colorado location of EPS' acts and omissions.

## FACTS COMMON TO ALL CLAIMS

9.      On August 4, 2009 Rader executed the Agreement with EPS to act as an independent sales representative without exclusive territory selling to merchants an EPS 90 "no credit check" financing system which included retail point of sale ("POS") terminals equipment for customer credit and debit card swipes, customer debit PIN entry and customer check imaging.

10.      A true and correct copy of the complete written Agreement is attached as Exhibit A.

11.      A true and correct copy of the complete written Guidelines referred to in the Agreement is attached as Exhibit B.

12.      Exhibit A and B together represent all written terms governing Rader's independent sales representation of EPS.

13.       Petland, Inc. ("Petland") is an Ohio corporation headquartered in Chillicothe, Ohio.

14.     Petland is generally in the business of pet and pet supplies retail sales in approximately one hundred forty (140) corporate and franchise operated stores located in twenty one (21) states in the United States and additional stores located in Canada, Mexico, China, Japan and South Africa.

15.     In September 2009 Rader made a successful sales presentation of the EPS 90 system to a Petland franchise store owner in Columbus, Ohio who wanted this system.

16.     Petland had a corporate policy requiring Petland's corporate evaluation and approval of any vendor before any Petland store whether company or franchise operated could offer or use a new product.

17.     In October 2009 Rader met in-person with the Petland director of finance at Petland's corporate headquarters to make his sales presentation how the EPS 90 system would greatly benefit all Petland stores by increasing in-store sales.

18.     Shortly after this meeting Petland approved Rader and EPS as a Petland corporate vendor and allowed the very first use of the EPS 90 system in a Petland store.

19.     The Petland director of finance wanted to first introduce the EPS 90 system in the Columbus franchise store Rader had initially approached and in Petland's company store in Chillicothe Ohio.

20.     On October 11, 2009 the Columbus franchise store owner signed the written form EPS 90 Merchant Application and Merchant Processing Agreement that Rader presented.

21.     On October 12, 2009 Petland's director of finance signed the written form EPS 90 Merchant Application and Processing Agreement that Rader presented.

22.     On or shortly after October 14, 2009 Rader sent the two executed EPS 90 Merchant Application and Processing Agreements to EPS for EPS' acceptance of both Petland corporate and the particular Columbus franchise store as an "Approved Merchant" as the quoted term is defined and used in the Exhibit A Agreement.

23.     On or before November 2, 2009 EPS accepted both Petland corporate and the Columbus franchise store as an "Approved Merchant" and Rader's sales efforts first procured Petland corporate and the particular Columbus franchise store for inclusion in EPS's "Merchant Portfolio" as both quoted terms are defined and used in the Exhibit A Agreement.

24.     Rader's procurement of Petland corporate and the particular Columbus franchise store for inclusion in EPS's "Merchant Portfolio" entitled Rader to compensation in two ways; first for each EPS 90 system contract signed and second, for each EPS 90 system transaction made thereafter in the percentage amounts determined in Schedules A and B to the Exhibit A Agreement.

25.     By November 3, 2009 EPS had paid Rader initial compensation for store EPS 90 contract sign ups totaling $ 4,132.12 for the procurement of Petland corporate and the particular Columbus franchise store.

26.     Each EPS 90 systems contract included recurring monthly charges for rental of necessary in-store POS terminals equipment.

27.     Before November 1, 2009 the Petland stores in Chillicothe and Columbus began using the EPS 90 system.

28.     On December 1, 2009 EPS paid Rader monthly residual income of $126.50 for Petland and the Columbus franchise store use of the EPS 90 system.

29.     On January 1, 2010 EPS paid Rader monthly residual income of $274.50 for procurement of Petland and the Columbus franchise store.

30.     Not long after this payment EPS' president, John Dorsey told Rader in a phone conversation that if Rader put together the Petland deal for EPS Rader could expect to receive over $500,000 in compensation from this account.

31.     By January 20, 2010 the December EPS 90 system usage results for the Petland stores in Chillicothe and Columbus had been compiled. Rader reported these strong results to Petland's director of finance along with Rader's request to discuss increasing Petland's sales growth further by putting the EPS 90 system in all Petland stores.

32.     On January 21, 2010 Petland's director of finance informed Rader that Petland was probably ready for the next step and wanted a discussion with Petland's account principals to go over the details in doing so.

33.     On January 30, 2010 Rader reported to  Petland's director of finance that he made arrangements for EPS to provide the December results reports and to schedule their meeting to discuss a roll out plan for putting the EPS 90 system in all Petland stores by region starting with Ohio.

34.     On January 30, 2010 Petland's director of finance invited Rader to attend a February 2nd conference call also with EPS's then marketing head, Greg White.

35.     On February 1, 2010 EPS paid Rader residual income of $333.50 from procurement of Petland and the Columbus franchise store.

36.     Before the February 2nd conference call Greg White told Rader that Rader did not need to be included in the call because nothing important would be discussed.

37.     On February 2, 2010 Petland's director of finance called Rader after the conference call with EPS' Greg White ended to tell Rader how Petland planned to roll out the EPS 90 system to other Petland stores.

38.     In a later e-mail to Rader also on February 2, 2010 Petland's director of finance informed Rader that a third Petland store, a franchise location in Overland Park, Kansas had also been included at Petland's request to EPS in the initial EPS 90 system use along with the Chillicothe and Columbus Petland stores and that Rader "might want to connect with Greg [White] to discuss EPS' plan to handle the Petland accounts."

39.     EPS had not informed Rader beforehand that the Petland franchise location in Overland Park, Kansas had been included in the initial EPS 90 system use.

40.     EPS had not paid Rader any initial compensation or subsequent residual income for the Overland Park, Kansas franchise store's use of the EPS 90 system.

41.     On February 3, 2010 Rader wrote an e-mail to EPS's Greg White questioning why EPS had not disclosed to Rader the existence of the third Petland store in Overland Park, Kansas using the EPS 90 system and why Rader had not been paid any compensation for this third store as well as to clarify Rader's role as the EPS account representative for all Petland stores.

42.     EPS's Greg White did not reply to Rader's e-mail or call Rader on the phone at any time after receipt of Rader's February 3, 2010 e-mail to address these issues Rader raised.

43.     On March 1, 2010 and after to present day Rader has not received any residual income payment of any amount from EPS.

44.     After February 3, 2010 Rader sent repeated e-mail to EPS's Greg White and also began to telephone White as well as e-mail EPS' president, John Dorsey to discuss the issues previously raised by Rader.

45.     On March 28, 2010 Rader sent an e-mail to EPS' Dorsey informing Dorsey that Rader had unsuccessfully attempted to reach Greg White repeatedly and renewed Rader's questions why he had not been paid any compensation for the Overland Park, Kansas Petland store, why Rader had not continued to receive his EPS residual income payment for Petland and the Columbus franchise store, and also why Rader had not been paid for the other Petland stores that had subsequently began using the EPS 90 system.

46.     On March 31, 2010 Dorsey sent a reply e-mail to Rader representing that Petland wanted only "to work with us [EPS] direct[sic]", denying knowledge why Petland did not want Rader "as there[sic] agent" and also offering the denial that "there[sic] not setting up all their stores anyways[sic]".

47.     However, since February 2, 2010 to the present time most if not all Petland corporate and franchise stores in the United States have and are using the EPS 90 system.

48.     On April 29, 2010 Rader sent a letter addressed and sent to EPS' Dorsey demanding EPS' payment of his compensation associated with Petland store EPS 90 system use to up that point in time as well as to raise EPS' interference with Rader's established contractual relationship with Petland through its director of finance.

49.     EPS and Dorsey received Rader's letter and ignored Rader's demand for payment to the present time.

50.     EPS and Dorsey have not responded in any way to address the issues Rader raised in this letter to the present day.

## COUNT I

51.     Rader is included within the statutory scope of Wholesale Sales Representatives Act found at Colo. Rev. Stat. § 12-66-101 *et seq*.

52.     EPS knowingly and with intention violated the Act when failing to pay Rader his compensation due on and after March 1, 2010 and continuing to present day after Rader called EPS' attention to the failure to pay him by the March 31, 2010 Dorsey e-mail and the April 29, 2010 Dorsey letter.

53.     EPS is liable to Rader for unpaid compensation, the amount of prejudgment interest accrued on those damages from March 1, 2010 to present day, a trebling of Rader's damages as well as prevailing party attorney fees and costs.

## COUNT II

54.     Rader had a contractual relationship with Petland established October 12, 2009 by executed written agreement to sell the EPS 90 system to Petland's company and franchise operated stores.

55.     Rader presented an EPS 90 roll out plan to Petland on and after January 20, 2010 to include other Petland stores by region, first beginning with Ohio after the strong December 2009 EPS 90 system usage results were known.

56.     EPS knowingly and with intention interfered with Rader's contractual relationship with Petland on or around February 2, 2010 by informing Petland that EPS corporate officers would exclusively handle Petland's EPS 90 roll out from that point in time on to Rader's exclusion and would give Petland much better financial terms for the EPS 90 roll out than Rader could provide.

8

57.     As a consequence of EPS' interference, on February 2, 2010 Petland's director of finance stopped discussion of the EPS 90 roll out with Rader and directed him to instead contact Greg White at EPS to discuss EPS' plan to handle the Petland accounts.

58.     When Rader did as directed Greg White at EPS ignored all Rader's repeated requests for information and furthering EPS' plan to exclude Rader from any further participation in Petland's EPS 90 roll out.

59.     In March 2010 Rader's sign in Agent's access on EPS' website allowing him to monitor Petland account activity no longer worked and this completed EPS' plan to exclude Rader from any further participation in Petland's EPS 90 roll out.

60.     As a consequence of EPS' interference misconduct Rader lost the initial compensation from the sale of the EPS 90 system to each and every Petland store which got the EPS 90 system after February 2, 2010 to the present time as well as the residual income from each Petland store EPS 90 transaction made afterward.

## COUNT III

61.     EPS breached the attached Exhibit A Agreement when failing to pay Rader his compensation due on and after March 1, 2010 and continuing to present day.

62.     EPS has never given Rader to present day the required thirty (30) day advance written notice of termination expressly required by Agreement Paragraph 13.

63.     Rader properly performed at all times and in all respects as the Agreement required and did not breach any Agreement representation, warranty or covenant nor was ever in default of any Agreement section, covenant or provision.

64.   EPS had no cause at any time to terminate the Exhibit A Agreement by invoking the immediate Agreement termination without notice clause also expressly found in Agreement Paragraph 13.

## COUNT IV

65.   The Exhibit A Agreement gave EPS discretion throughout the Agreement to control the commercial relationship between the parties to its advantage and Rader's detriment, including termination "at any time and for any reason" requiring advance written notice yet also allowed immediate termination and without any notice to Rader if EPS deemed a breach of "any representation, warranty or covenant" or "default of any section, covenant or provision" had occurred (Paragraph 13).

66.   EPS violated the Exhibit A Agreement implied covenant of good faith and fair dealing on or around February 2, 2010 through present day by EPS' various acts and omissions set forth above in Paragraphs 36 - 50 incorporated herein by reference in this Count as Paragraphs 67 - 82.

83.   As a consequence of EPS' breach, Rader lost the initial compensation from the sale of the EPS 90 system to each and every Petland store which got the EPS 90 system after February 2, 2010 to the present time as well as the residual income from each Petland store EPS 90 transaction made afterward.

## COUNT V

84.   EPS has been unjustly enriched by reaping the enormous financial benefit of Rader's sales work which created the commercial relationship with Petland and brought Petland into EPS' "Merchant Portfolio" in the first place but avoiding payment to Rader thus far of his equitable share on March 1, 2010 and after to present day by

ignoring Rader's repeated written requests made in good faith for both information and payment.

85.     Rader seeks the equitable remedy of disgorgement.

WHERFORE plaintiff, RANDALL RADER seeks trial by jury and demands judgment against defendant, ELECTRONIC PAYMENT SYSTEMS, LLC in an amount exceeding SEVENTY FIVE THOUSAND ($75,000) determined by the jurors to be fair compensation exclusive of prevailing party attorney fees and costs or in the alternative such equitable relief the Court determines is just.

Respectfully submitted,

/s/ Steven C. Fuoco
**Steven C. Fuoco**
Fuoco Law Group, Ltd.
1055 Golf Avenue
Highland Park, IL 60035
Phone: 847/432-LAWS (5297)
Fax: 847/681-9596
E-mail: fuocolawgroup@gmail.com
Counsel for Randall Rader

# MARKETING AGREEMENT

**This Agreement** ("Agreement") is entered into by and between Electronic Payment Systems, LLC (EPS) and _RANDALL RADER_ this _4 +H_ day of _August_, 2009.

This Agreement is binding upon _____, its principals, owners, Affiliates, Affiliated entities, parent entities, agents, employees, Independent Contractors, subcontractors, successors and assigns, as well as all individuals who have signed the Agreement, their heirs, successors and assigns, (referred to collectively as "Contractor"). It shall be the responsibility of Contractor to ensure that any and all agents, employees, Independent Contractors, or other representatives of Contractor comply fully, completely and unconditionally with the provisions of this Agreement.

## RECITALS

**WHEREAS,** EPS is engaged in the business of marketing and selling a credit/debit card processing service, check guarantee/verification processing service, check conversion processing service, card and check processing equipment, business and personal Internet and web site development services including but not limited to credit/debit card processing on the World Wide Web, warranty programs and other related services (collectively, the "Processing Service") to retail entities, mail order and telephone order entities, Internet entities and others (collectively, the "Merchants"); and

**WHEREAS,** EPS wishes to hire Contractor as an Independent Contractor to assist in the selling and marketing of the Processing Service to Merchants; and

**WHEREAS,** EPS requests that Contractor enter into this agreement so that EPS may protect its legitimate interests through non-disclosure and other contractual provisions contained herein; and

**WHEREAS,** Contractor has agreed to enter into this Agreement and to be bound by the contractual provisions contained herein in order to receive the substantial benefits set forth herein and which EPS would not otherwise confer upon Contractor.

**EXHIBIT**

A

*RR*

# DEFINITIONS

As used in the Agreement, the following capitalized terms shall have the meanings set forth below:

**"Affiliate or Affiliates"** shall mean any entity that directly or indirectly controls, is controlled by, or is under common control with, the entity in question.

**"Affiliated"** shall refer to the relationship in which an entity is connected or associated with another entity.

**"Applicable Laws and Regulations"** shall mean all laws, rules, regulations, and regulatory policies of, or administered or enforced by, any local, state or federal agency or governmental or other body applicable to EPS, Contractor, Merchants, Merchant Accounts, account materials, Application Materials, Promotional Materials, any transactions contemplated by this Agreement, or any matter relating to any of the foregoing, including, without limitation, all rules and regulations promulgated by VISA and MasterCard and the laws administered by, and the rules, regulations, and regulatory policies of, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation.

**"Application Materials"** shall mean the application and all other developed materials that are prescribed by EPS and/or Provider to facilitate the establishment of accounts as they relate to or are a part of the Processing Service.

**"Approved Merchant"** shall mean any Eligible Merchant that is accepted by EPS and Provider for participation in the Processing Service and enters into an agreement for such service.

**"EPS or Electronic Payment Systems, LLC"** shall refer to and include Electronic Payment Systems, LLC, A Colorado limited liability company, as well as its successors and assigns.

**"Eligible Merchant"** shall mean a Merchant that meets the Program Approval Standards, is not doing business with EPS as of the date of application, and is solicited by Contractor to participate in the Processing Service.

**"Good Standing"** shall mean a Contractor that is in compliance with all representations, warranties, sections, covenants and provisions of this Agreement and  providing proper levels of support and service to Merchants provided to EPS.

**"Independent Contractor"** shall mean a type of status or classification and is used to further define the relationship of the parties.

**"Loss or Losses"** shall mean any losses, damages, liabilities, judgments, order of restitution, cease and desist order, penalties (including civil monetary penalties and VISA and MasterCard fines and penalties), costs and expenses, including, without limitation, any attorneys' fees and court costs reasonably incurred by an indemnified party or other entity.

**"MasterCard"** shall mean MasterCard International Incorporated.

**"Material"** when used with reference to information, a fact or circumstance, a course of action, a decision-making process or other matter, shall be limited to information, facts and circumstances, courses of action, decision-making processes or other matters as to which there is a substantial likelihood that a reasonable person would attach importance in determining whether to enter into this Agreement or in the manner of conducting business under this Agreement.

**"Merchant Account"** shall mean the account relationship established between EPS, Provider and an Approved Merchant pursuant to a Merchant Processing Agreement.

**"Merchant Application"** shall mean the forms and Application Materials designated by EPS and required to enroll a Merchant in the requested Processing Service.

**"Merchant Portfolio"** shall mean a base or group of Approved Merchants participating in the Processing Service pursuant to Merchant Processing Agreements and this Agreement or otherwise made a part of the Processing Service.

**"Merchant Processing Agreement"** shall mean a written agreement among EPS, Provider and an Approved Merchant that governs the Approved Merchant's participation in the Processing Service, which agreement shall be acceptable to EPS and Provider.

**"Program Approval Standards"** shall mean a minimum standard by which a Merchant shall be evaluated and considered for participation in the Processing Service. These standards may include but will not be limited to: (I) a review of the principals' credit history, (II) confirmation that the business type is not one that is contained in the prohibited merchants list, (III) a review of previous processing statements if applicant has previous processing, and (IV) a review of all Application Materials and the Merchant Application.

**"Promotional Materials"** shall mean all verbal and written solicitations and advertisements and other communications (including telemarketing scripts) used to market, promote and solicit the establishment and/or enrollment of Merchants.

**"Provider"** shall mean an entity that makes available and/or provides a product, goods, or service that is part of the Processing Service or supports the Processing Service.

**"VISA"** shall mean VISA U. S. A., Inc.

**NOW, THEREFORE,** in consideration of the premises and mutual promises contained in this Agreement, the parties agree as follows:

1.  CONTRACTOR OBLIGATIONS. Contractor shall assist EPS in marketing and selling the Processing Service by soliciting potential Merchants and calling on existing Merchants who are not at the time of solicitation Merchants of EPS upon the terms and conditions set forth below.

    1.1  GUIDELINES. Contractor agrees to perform the duties hereunder in accordance with the written guidelines prepared by EPS and Contractor acknowledges receipt of such guidelines (guidelines contained in the document "Sales Standards and Procedures for Independent Sales Representatives") and agrees to follow them. The EPS guidelines as they exist at the time the Agreement is executed are incorporated by reference. EPS may amend, supplement or otherwise modify the guidelines at any time and from time to time without the consent of Contractor. EPS shall deliver notice and a copy of such amended, supplemented or otherwise modified guidelines to Contractor as provided for herein. Unless Contractor objects in writing within TEN-(10) days of receipt of such changes Contractor shall be deemed to have waived any right to dispute the amended, supplemented or otherwise modified guidelines. At such time, the amended, supplemented or otherwise modified guidelines shall be incorporated by reference as if set out in full herein. EPS from time to time will also provide Contractor with EPS sales materials as EPS deems in its sole discretion to be requisite for Contractor to perform its duties hereunder.

    1.2  USE OF LOGO'S, TRADEMARKS, MARKETING/PROMOTIONAL MATERIALS AND SCRIPTS. Contractor **SHALL NOT** use the Visa or

MasterCard Logo's or trademarks on business cards, stationery or any other media outside of the approved materials. Unless otherwise stated **ALL** marketing/promotional materials and scripts must be **PREAPPROVED BY EPS PRIOR TO USE** and/or distribution. Contractor shall submit all proposed advertisements to EPS in advance for its review and approval.

1.3     <u>DUTIES</u>. Using the EPS Guidelines, Contractor shall, during the term of this Agreement or subsequent renewal terms, market and sell the Processing Service for EPS, make presentations of the Processing Service, and other related services to potential Merchants, complete market survey and/or Merchant Application paperwork, instruct Merchants on deposit or other bank related requirements of the Processing Service as EPS may, from time to time designate. Contractor may perform such duties at such times and at such locations within the designated territories, if any, as Contractor may determine. Contractor shall forward any and all paperwork within Contractor's care directly, exclusively and without exception, in a timely manner without delay, to EPS or such other entity or place as EPS may, from time to time designate.

1.4     <u>TELEMARKETING AND "NO CALL" LISTS</u>. If Contractor utilizes telemarketing in the course of operating their business Contractor agrees to abide by all Applicable Laws and Regulations and required procedures for the area of the country they are located in or conducting business in. If a "NO CALL" list is in force in the area of the country Contractor is operating from or in, Contractor shall abide and comply with the requests of the call recipient and follow all guidelines as they relate to the laws, rules and/or regulations.

1.5     <u>GOOD FAITH</u>. Contractor and all representatives of Contractor shall act honestly and in good faith in all dealings. Contractor shall notify EPS immediately of any action or omission by Contractor or Merchant of which Contractor is aware which could result in any Loss or liability to EPS or any of its Affiliates, contractors or Providers or financing entities. Merchants who do not meet the established credit policy of EPS and/or Providers, both written and in practical application shall not be solicited by Contractor or induced into paying application fees to Contractor.

1.6     <u>REPRESENTATIONS TO MERCHANTS</u>. Contractor may not state or imply that the approval of EPS is guaranteed or unnecessary. EPS, in its sole and absolute discretion, shall make final determination as to whether or not to accept any prospective Merchant. EPS shall have the right, in its sole and absolute discretion, to terminate any

contract between EPS and a Merchant without notice to or consultation with Contractor.

1.7     LIMITATIONS OF AUTHORITY. Contractor shall have no authority whatsoever (I) to bind EPS and/or Provider to any contract or any agreement or to incur any obligation on behalf of EPS and/or Provider, (II) to release, assign or transfer an EPS or Provider agreement, claim, security or any other asset or interest belonging to or in the control of EPS and/or Provider, (III) to borrow any money in the name of EPS and/or Provider or lend any money belonging to EPS and/or Provider, (IV) to represent EPS and/or Provider in any way other than as described herein or in the EPS Guidelines or sales standards and procedures provided to Contractor, or (V) to submit any claim or liability related to the Processing Service to arbitration or confess a judgment against EPS and/or Provider. Contractor specifically agrees the terms and conditions of any contractual agreement between a Merchant and EPS and/or the Provider, will be established, from time to time, by EPS and/or the Provider, and that Contractor has no authority to make any representations, warranties, agreements or guarantees with respect to such contracts. Contractor will, at all times, use, without modification or change, the forms of the agreement between Merchant and EPS and/or Provider as are furnished to Contractor by EPS and/or Provider.

1.8     RELATIONSHIP TO PROVIDERS.  Notwithstanding any of the rights contained in the agreements between Providers and Merchants, Contractor shall afford the same rights, privileges and protections afforded EPS in this Agreement to all Providers and/or product vendors covered under this Agreement.

1.9     INDEPENDENT CONTRACTOR. Contractor understands, represents and warrants that they are an independent contractor and not an employee, agent, officer or representative of EPS or joint venturer with EPS.  Contractor further understands that EPS will not (I) exercise any behavioral control over Contractor, (II) provide any training outside of answering rudimentary questions of process, policy  and procedure, (III) furnish any work materials to Contractor other than those set forth herein and in the EPS Guidelines, (IV) furnish a work place, telephone, automobile or any other equipment to Contractor, or (V) reimburse Contractor for business expenses or any cost whatsoever incurred by Contractor in the course of its solicitation of Merchants for Processing Service.

1.10    TAXES.  Contractor agrees to be responsible for and pay all applicable taxes required by any and all governing bodies or agencies including but not limited to; Town, Township, City, County, State and Federal authorities for the specific area of the

country in which they are located or conduct business. This requirement extends not only to income taxes but also shall include and not be limited to; sales, withholding, personal property, real estate, use and self employment taxes. Contractor acknowledges that they will at all times stay current with the above obligations. If at any time Contractor fails to maintain a current status with any tax obligation they will advise EPS in written form of such delinquency immediately.

1.11   RESPONSIBILITY FOR COMPLIANCE. Contractor understands and agrees that the obligations contained herein are reasonable and necessary to protect the interests of EPS and Providers. Contractor further understands that a lack of compliance with the obligations or breach thereof by Contractor shall constitute a Material breach of this Agreement. Contractor accepts the responsibility of maintaining compliance with all the obligations, agreements, covenants and provisions of this Agreement.

2.   FIRST RIGHT OF REFUSAL. As a consideration of EPS entering into this Agreement with Contractor, Contractor agrees to submit all applications for processing services to EPS on a "First Right Of Refusal" basis. Contractor has the option to send applications elsewhere in the event of one of the following circumstances or occurrences but in no others: (I) any application that is declined by EPS, (II) any merchant type that is on the prohibited merchants list, (III) any application that is in the possession of EPS for a period of THREE (3) business days that does not receive an approval regardless if it is approved at a later time or date, and (IV) an acceptable platform to transact the type or method of business the merchant intends to perform is not available through EPS.

3.   COMPENSATION. Compensation shall be earned and paid in accordance with the terms and provisions of the Schedule A attached hereto and incorporated herein by reference. This compensation shall be subject to all applicable governmental standards, taxes, assessments or other requirements. Contractor shall not be entitled to any benefits, vacation, compensation or reimbursement for their services except as expressly provided herein. In the event this Agreement terminates for any reason other than the satisfactory completion of the initial term or a subsequent renewal term, EPS shall have no obligation to continue with any form of compensation. Upon the completion and expiration of the initial term or any subsequent renewal term Contractor shall receive compensation as contained herein and subject to any vesting requirements.

3.1   VESTING (VESTED INTEREST). Based on requirements contained

herein and the distribution specified in the Schedule A, Contractor may obtain a vested interest in the merchants provided to the Merchant Portfolio as follows: (I) The net value of the merchants Contractor provides to EPS in the event of a sale of the subject merchants, (II) The residual income stream those merchants generate up until the event of a sale of the subject merchants, or (III) The net value of the merchants Contractor provides to EPS in the event of a sale and the residual stream those merchants generate up until the event of a sale of the subject merchants.  Any vested interest or vesting is considered compensation and subject to the requirements contained in section 3 <u>COMPENSATION</u> and section 1 <u>CONTRACTOR OBLIGATIONS</u> and all applicable sub-sections thereof of this Agreement.  In general, Contractor attaining a vested interest shall be entitled to received agreed compensation from the residual income stream without volume requirement and, until and in the event of a sale, to the agreed percentage outlined in the Schedule A attached hereto of the net proceeds of a sale of the merchant portfolio.  EPS shall have no obligation to pay any proceeds of any sale until EPS has received all compensation due EPS and EPS has had a reasonable amount of time (not to exceed NINETY (90) days from the date of receipt of final proceeds) to assign necessary costs, expenses, fees, deconversion and/or conversion expense, transfer expense and consider all tax ramifications related to the sale to establish the net proceeds of the sale.

4.    <u>EQUIPMENT AND SUPPLIES PURCHASE REQUIREMENT</u>.  As a requirement of purchasing equipment and/or supplies from EPS Contractor hereby unconditionally agrees to be liable for and pay for any and all items received.  If Contractor fails to dispute the validity of any debt for equipment and/or supplies in writing within SIXTY (60) calendar days of receipt, Contractor shall be deemed to have waived any right to dispute the debt or the amount of such debt.  To protect and perfect their obligation herein Contractor hereby pledges any and all income due or to become due Contractor as a result of marketing and selling the Processing Service. In addition to the foregoing Contractor further pledges any personal assets, accounts or holdings in their possession or that come into their possession.  In the event Contractor does not fully satisfy any obligation under this provision within SIXTY (60) calendar days of the occurrence of such liability Contractor will be considered in default of this section of this Agreement.  In the event of a default, Contractor shall reimburse EPS for reasonable collection and attorney fees expended on the part of EPS to collect such debt.

5.   TERM. This Agreement shall be effective from the date hereof and shall remain in full force and effect for a period of THREE (3) years as an initial term, unless sooner terminated as set forth herein. Upon the completion of the initial term, unless EPS or Contractor furnishes written notice of non-renewal at least SIX (6) months prior to completion of the then existing term, this Agreement shall renew automatically for additional THREE (3) terms in perpetuity unless canceled in accordance with the provisions contained in the Agreement.

6.   ASSIGNMENT Contractor shall not assign its rights nor delegate its duties under this Agreement nor grant or permit to exist a lien or security interest with respect to such rights without the advance written consent of EPS.

7.   REPRESENTATIONS, WARRANTIES AND COVENANTS.

   7.1   REPRESENTATIONS TO MERCHANTS. Contractor shall not make any representations to a Merchant or prospective Merchant other than those set forth in the contracts between EPS, its affiliated banks and financing entities, and the Merchant. Contractor shall not conceal any material facts from the Merchant or prospective Merchant.

   7.2   REPRESENTATIONS OF CONTRACTOR ABOUT MERCHANTS. By submitting a Merchant Application to EPS Contractor represents and warrants (I) that they have performed a SITE SURVEY REPORT in accordance with the MERCHANT PROCESSING AGREEMENT; and (II) that this Merchant is deserving of a Merchant Account. Contractor understands and acknowledges that, based on the forgoing representations and warranties made by Contractor an account may be established for Merchant.

   7.3   POLICIES AND PROCEDURES. Contractor shall abide by the policies and procedures of EPS.   These policies and procedures may be changed by EPS from time to time in the sole discretion of EPS. Contractor shall be responsible for complying with the policies and procedures in effect at any given time.   Policies of all Providers as they relate to offering of the Processing Service shall be strictly adhered to by Contractor without exception.

   7.4   DECEPTIVE ACTS. Contractor shall not engage in any illegal, fraudulent or deceptive acts or practices in the course of performing their duties hereunder or undertake any actions or inaction, which is against the best interest and expectations of EPS and/or Provider entities  or in violation of any Applicable Laws and

Regulations.

7.5 <u>RESPONSIBILITY FOR COMPLIANCE</u>.  Contractor understands and agrees that the stated representations, warranties and covenants contained herein are reasonable and necessary to protect the interests of EPS and Providers.  Contractor further understands that a lack of compliance with the stated representations, warranties and covenants or breach thereof by Contractor shall constitute a Material breach of this Agreement.  Contractor accepts the responsibility of maintaining compliance with all stated representations, warranties and covenants of this Agreement.

8.   <u>INDEMNIFICATION</u>.

8.1 <u>INDEMNIFICATION AND HOLD HARMLESS</u>. Contractor hereby agrees to indemnify EPS and hold EPS harmless from and against any and all claims, Losses, damages, liabilities, fines, penalties and expenses including but not limited to attorney's fees and litigation costs, arising from or related to (I) any act, actions or omissions by Contractor including but not limited to, any intentional or negligent tort, (II) any deceptive trade practice, or (III) any fraud in connection with Contractor selling and marketing of the Processing Service, (IV) any breach by Contractor of the covenants and agreements made by it in this Agreement, and (V) any fine or penalty imposed upon or Losses suffered by EPS.  This Agreement by Contractor to indemnify shall continue and survive the expiration or termination of this Agreement.

8.2 <u>LITIGATION AGAINST EPS BASED ON ACTIONS OF CONTRACTOR</u>. In the event of any suit or the threat of suit against EPS for actions of Contractor it shall be the responsibility of Contractor to provide for the representation and/or defense of EPS.  The selection of legal counsel shall be at the sole and absolute discretion of EPS.  All reasonable efforts will be made by EPS to choose such counsel based on knowledge of and experience in the industry, billable rates, and other relevant factors.  If a settlement is proposed, provided Contractor is maintaining their obligation herein to pay for representation and/or defense, said settlement will be discussed with Contractor.  EPS shall, in its sole and absolute discretion, make all decisions as they relate to proposing, accepting or rejecting any settlement issues.  Furthermore, any judgment, monetary decision of the court and/or arbitrator against EPS, fine, penalty and/or Loss of any sort shall be the financial responsibility of Contractor.  To protect and perfect their obligation herein Contractor hereby

pledges any and all income due or to become due Contractor as a result of marketing and selling the Processing Service. In addition to the foregoing Contractor further pledges any personal assets, accounts or holdings in their possession or that come into their possession. In the event Contractor does not fully satisfy any obligation under this provision within THIRTY (30) calendar days of the occurrence of such liability Contractor will be considered in default of this section of this Agreement. In the event of a default, Contractor shall reimburse EPS for reasonable collection and attorney fees expended on the part of EPS to collect such debt.

8.3   NON-LIABILITY. Notwithstanding any representations, statements or acts by Contractor, neither EPS nor any Provider shall have any liability or obligation to Contractor, or any other person, firm or entity for any debt, contract, agreement, obligation or liability of Contractor incurred inside or outside the scope of this Agreement. In particular, and without limitation, neither EPS nor any Provider shall have any liability on any agreement entered into by Contractor or debt incurred by Contractor in the name of EPS, Provider or otherwise. Under no circumstance shall either EPS or any Provider be liable to the Contractor for damages incurred by Contractor in the performance of its duties hereunder, including any special, indirect, consequential or exemplary damages of any kind.

9.   CONFIDENTIAL INFORMATION. Contractor acknowledges that all information related to the Processing Service, including but not limited to fees, rates, charges, sales data, operational procedures, memoranda, sales kits, lists of Merchants and lists of potential Merchants have been prepared and maintained by EPS at significant cost and expense, that such information represents a method of business operation unique to the business of EPS being made available to Contractor pursuant to the terms of this Agreement, and that EPS deems such material confidential and that EPS has a proprietary interest therein. Contractor agrees it shall treat all confidential information as strictly confidential and proprietary to EPS, except to the extent that disclosure thereof is necessary in the fulfillment of Contractor's obligations under this Agreement. All confidential information is and at all times shall be the property of EPS, it being agreed that such information is confidential and that EPS has a proprietary interest therein. Contractor agrees that during the term of this Agreement and thereafter, it will not, directly or indirectly, either individually or as an employee, contractor, partner, shareholder, consultant or in any other capacity, use or disclose, or cause to be used or disclosed, any confidential information, regardless of whether Contractor may have participated in the development of any such confidential information,

except to the extent that use or disclosure thereof is necessary in fulfilling Contractor's obligation's under this Agreement.  The promises made in this paragraph by Contractor shall be construed independently of any other provisions contained in this Agreement and shall be enforceable in both law and equity, including by temporary restraining orders or preliminary or permanent injunction.  This Agreement by Contractor not to use or disclose shall continue and survive the expiration, termination and/or term of this Agreement.

10.   TRADE SECRETS.  "Trade Secrets" include but are not limited to, the whole or any portion or phase of any design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value.  EPS has taken measures to prevent its Trade Secrets from becoming available to persons other than those selected by EPS to have access thereto for limited purposes.  Contractor acknowledges that all information related to Trade Secrets has been prepared and maintained by EPS at significant cost and expense, that such information represents a method of business operation unique to the business of EPS being made available to Contractor pursuant to the terms of this Agreement, and that EPS deems such material confidential and that EPS has a proprietary interest therein.  Contractor agrees it shall treat all Trade Secrets as strictly confidential and proprietary to EPS, except to the extent that disclosure thereof is necessary in the fulfillment of Contractor's obligations under this Agreement.  All Trade Secrets are and at all times shall be the property of EPS, it being agreed that such information is confidential and that EPS has a proprietary interest therein.  Contractor agrees that during the term of this Agreement and thereafter, they will not, directly or indirectly, either individually or as an employee, contractor, partner, shareholder, consultant or in any other capacity, use or disclose, or cause to be used or disclosed, any confidential information, regardless of whether Contractor may have participated in the development of any such Trade Secret, except to the extent that use or disclosure thereof is necessary in fulfilling Contractor's obligation's under this Agreement.  Contractor acknowledges that the restrictions herein are reasonable and necessary in order to protect legitimate and proprietary interests of EPS and that any violation thereof would result in irreparable injury and damage to EPS to such a point that there would be no remedy at law sufficient to compensate for such.  The promises made in this paragraph by Contractor shall be construed independently of any other provisions contained in this Agreement and shall be enforceable in both law and equity, including by temporary restraining orders, preliminary and permanent injunctions.  This Agreement by Contractor not to use or disclose Trade Secrets shall

continue and survive the expiration or termination of this Agreement.

11.   UNAUTHORIZED MERCHANT ROLLOVER OR ALTERNATE BANK
      PLACEMENT.  Contractor agrees and acknowledges that to the extent
      permitted by applicable laws, rules and regulations, all interests in a
      Merchant or a Merchant's use of the Processing Service, other than the
      right of Contractor to receive compensation as provided herein, are the
      sole and exclusive property of and belong to EPS.  A business, individual,
      firm or entity, regardless of the form of such entity used to conduct
      business is considered a Merchant if they are currently, were at one time
      or, during the term of this agreement and any renewal thereof, become a
      customer of EPS using the Processing Service.  If, at any time after a
      merchant enters into an agreement for the Processing Service through a
      bank designated by EPS, Contractor contacts the Merchant and solicits,
      recommends or otherwise suggests in any way or form that the merchant
      obtain Processing Services through another processing bank or service
      provider, or if as a result of the efforts of the Contractor a merchant
      ceases to use the processing bank designated by EPS and commences to
      use a different processing bank, Contractor agrees to pay to EPS as
      compensation for such change as liquidated damages the sum of One
      Thousand Five Hundred Dollars ($1,500.00) per merchant.  The parties
      recognize that it may be difficult to measure the actual damages suffered
      by EPS as a result of such conduct by Contractor.  Therefore, Contractor
      agrees to pay the aforementioned liquidated damages in lieu of actual
      damages caused by Contractor to EPS.  This provision for liquidated
      damages in lieu of actual damages, shall not preclude EPS from pursuing
      additional amounts as special, consequential or exemplary damages.  To
      secure such payment, the Contractor agrees to and hereby assigns to EPS
      any and all rights the Contractor obtains to receive residual income or
      other payment or compensation of any kind as a result of the Merchant
      using the Processing Services of the bank other than the processing bank
      designated by EPS.  Contractor further agrees to provide written
      notification of this assignment to the new processing bank and in the
      event the Contractor fails to do so, Contractor consents to EPS providing
      notification of such assignment to the new processing bank.  To protect
      and perfect their obligation Contractor pledges any and all income due or
      to become due Contractor as a result of marketing and selling the
      Processing Service.  In addition to the foregoing Contractor further
      pledges any personal assets, accounts or holdings in their possession or
      that come into their possession.

12.   CONTRACTOR ACKNOWLEDGEMENT.  Contractor acknowledges that the
      restrictions herein are reasonable and necessary in order to protect
      legitimate and proprietary interests of EPS and that any violation thereof

would result in irreparable injury and damage to EPS to such a point that there would be no adequate remedy at law.

13.   <u>TERMINATION OF AGREEMENT</u>. EPS may terminate this Agreement at any time, for any reason upon thirty (30) days' written notice to Contractor. In the event of such termination, Contractor shall be entitled to receive all accrued but unpaid compensation to the effective date of such termination and shall be entitled to all interests that have vested as of the date of termination.  Upon expiration or termination of this Agreement, Contractor promptly shall surrender all items developed by Contractor pursuant to this Agreement and related to the Processing Service.  Notwithstanding anything to the contrary contained herein, if Contractor breaches any representation, warranty or covenant set forth herein or is in default of any section, covenant or provision of this Agreement EPS may terminate this Agreement immediately, without notice.  Contractor acknowledges that the requirements herein are reasonable and necessary in order to protect legitimate and proprietary interests of EPS and that any failure to perform thereof would result in irreparable injury and damage to EPS to such a point that there would be no remedy at law sufficient to compensate for such.

13.1   <u>RETURN OF DOCUMENTATION UPON TERMINATION OR EXPIRATION</u>.  Upon the expiration or termination of this Agreement, Contractor shall immediately surrender to EPS all materials provided by EPS or developed as a result or product of this Agreement, including all originals, copies and/or duplications of such in any form, and these items shall include but are not limited to: the EPS Guidelines, EPS Sales Standards and Procedures for Independent Sales representatives, lists of Merchants, lists of Potential Merchants, all files related to Merchants, forms, supplies, manuals, any information in any form that would be considered confidential or a Trade Secret as defined and outlined in this agreement, any other written, recorded, or taped information, any electronic media containing any of the listed items herein along with written assurance from Contractor that those items have been removed from their prior resident location and no other copies exist and, any property afforded Contractor by EPS.  Contractor shall further return any materials that contain proprietary or confidential information or Trade Secrets IN ANY FORM.  If there is any question of whether materials are confidential, proprietary or a Trade Secret they SHALL be considered to be so and returned to EPS immediately.

14.   <u>WAIVER</u>. The failure of either EPS or Contractor to insist, in any one or more instance, upon performance of the terms or conditions of this

Agreement, shall not be construed as a waiver or a relinquishment of any right granted hereunder or in the further performance of any such term, covenant or condition.

15. <u>NOTICES</u>. Any and all notices, requests, demands, and other communications which are required or may be given under or in connection with this Agreement shall be in writing and shall be deemed given when delivered in person or by telecopy or, if mailed, seventy-two (72) hours after being deposited in the United States mail, certified or registered, postage and certification or registry fee prepaid, addressed to the party to whom it is to be given at the address hereinafter specified. Change of address for notices must be submitted in writing and delivered as described herein thirty (30) days prior to any such change. The current address for notices is as follows:


**IF TO EPS, INC.:**




**IF TO CONTRACTOR**




16. <u>LEASE FUNDING PROVISION</u>. As a provision of accepting Lease Funding through EPS, Contractor hereby unconditionally agrees to be liable for and pay for any and all charge-back and/or recourse action or other Losses as a result of Lease Funding to Contractor including but not limited to (I) lease defaults regardless of reason during the liability period as described in the attached "Schedule A," (II) defaults as a result of fraud, misrepresentation, forgery or document alteration, (III) interference with contract between Merchant and lessor by Contractor, (IV) improper repossession of leased equipment by Contractor, and (V) acceptance by Contractor of returned leased equipment from lessee. To protect and perfect their obligation herein Contractor hereby pledges any and all income due or to become due Contractor as a result of marketing and selling the Processing Service. In addition to the foregoing Contractor further pledges any personal assets, accounts or holdings in their possession or that come into their possession. In the event Contractor

does not fully satisfy any obligation under this provision within THIRTY-(30) calendar days of the occurrence of such liability Contractor will be considered in default of this section of this Agreement. In the event of a default, Contractor shall reimburse EPS for reasonable collection and attorney fees expended on the part of EPS to collect such debt.

17.   **COMPETITIVE ACTIONS.**

17.1   In consideration of EPS entering into this Agreement with Contractor and as a condition of acceptance to this Agreement by EPS, Contractor agrees, during the term of this Agreement not to represent any other entity for Processing Service, check guarantee/verification service, warranty programs, equipment leasing and other related services other than EPS and the services they make available to Contractor which, from time to time, may change.

17.2   In consideration of EPS entering into this Agreement with Contractor and as a condition of acceptance to this Agreement by EPS, Contractor agrees, at the termination of this Agreement, to take no action that would be considered to be in competition with EPS in any of the areas, States or localities serviced by EPS. Contractor acknowledges that the restrictions herein are reasonable and necessary in order to protect legitimate and proprietary interests of EPS and that any violation thereof would result in irreparable injury and damage to EPS to such a point that there would be no legal remedy at law sufficient to compensate for such. Competitive acts include but are not limited to, offering Processing Service, check guarantee/verification, warranty programs, equipment leasing and other related services, directly or indirectly, either individually or as an employee, Independent Contractor, partner, shareholder, consultant or in any other capacity. This will remain in force for a period of two (2) years from the date of termination. The promises made in this paragraph by Contractor shall be construed independently of any other provisions contained in this Agreement and shall be enforceable in both law and equity, including by temporary or permanent restraining orders.

17.3   In consideration of EPS entering into this Agreement with Contractor and as a condition of acceptance to this Agreement by EPS, Contractor understands that all entities that Contractor utilizes in any competitive act, in any capacity will be pursued to the full extent allowable at law and   Contractor hereby unconditionally grants EPS full and complete authority to pursue and secure damages from said entities. Contractor further acknowledges that

this restriction is reasonable and necessary in order to protect legitimate and proprietary interests of EPS and that any violation thereof would result in irreparable injury and damage to EPS to such a point that there would be no legal remedy at law sufficient to compensate for such.

18.  **MISCELLANEOUS.**

   (a) This is the entire agreement between Contractor and EPS, with respect to the subject matter hereof, and supersedes any prior agreement or discussions or correspondence, oral or written, between Contractor and EPS. The schedule attached hereto and the EPS Guidelines are incorporated herein by reference as if set out in full herein.

   (b) This Agreement and all questions arising in connection herewith shall be governed by and construed in accordance with the laws of the State of Colorado, and all suits hereunder or in respect hereto by either party shall be instituted in the Colorado courts or in the United Sates District Court for the District of Colorado and in no other venue or jurisdiction. Contractor HEREBY SUBMITS TO THE JURISDICTION AND VENUE OF THE COURTS OF THE STATE OF COLORADO OR IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO, AND HEREBY CONSENTS TO SERVICE OF PROCESS AT CONTRACTOR'S ADDRESS SET FORTH IN SECTION 16 ABOVE.

   (c) The section headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

   (d) In the event that more than one Contractor claims to have recommended a Merchant in connection with this Agreement or similar agreements, EPS shall determine in its sole discretion, which approved Contractor shall receive compensation therefor.

   (e) Nothing contained in this Agreement shall be construed to constitute a joint venture or partnership between or among any persons or entities referred to herein.

   (f) If any provision of this Agreement is at any time adjudged invalid or unenforceable to any extent by any court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to render it valid and enforceable and such invalidity or unenforceability shall not affect any other provision of this

Agreement.

(g) CONTRACTOR ACKNOWLEDGES THAT THIS IS A LEGAL DOCUMENT AFFECTING CONTRACTOR'S RIGHTS AND OBLIGATIONS. CONTRACTOR FURTHER ACKNOWLEDGES THAT IT HAS BEEN ENCOURAGED TO HAVE THIS AGREEMENT REVIEWED BY COUNSEL OF CONTRACTOR'S CHOOSING PRIOR TO ENTERING INTO THIS AGREEMENT AND THAT CONTRACTOR HAS CONSULTED WITH SUCH COUNSEL TO THE EXTENT IT DESIRES TO DO SO. Contractor acknowledges that they are entering into a legal and binding agreement and are fully aware of all ramifications therein.

(h) By affixing their signature(s) hereto on behalf of the Contractor, the undersigned individual(s) represent and affirm that they are binding themselves personally and further that Contractor has the power and authority to enter into this Agreement and the execution and delivery of the Agreement and the performance of Contractor's obligations hereunder have been duly authorized by all necessary corporate or company action.

(i) Contractor represents and affirms that neither the execution or performance of this Agreement by Contractor will conflict with, or result in a breach of, or give rise to a right of termination of, or accelerate the performance required by the terms of any judgment, court order or consent decree, or any agreement, including without limitation, a restrictive covenant or covenant against competition, or other instrument to which Contractor is a party, or constitute a default thereunder.

19.   OFFSET.   EPS reserves the right to offset any amounts owed by Contractor against any earned income of Contractor, regardless of source, without prior notice, including but not limited to Lease Chargebacks, Equipment Purchases, and Supplies Purchases.

20.   CREDIT REPORT AUTHORIZATION. Contractor authorizes EPS to obtain an investigative and/or consumer credit report, personal and/or commercial in nature, in connection with this Agreement.

— This Section Intentionally Left Blank —

**IN WITNESS WHEREOF,** The undersigned have executed this Agreement as of the date first written above.

## CONTRACTOR

CONTRACTOR SIGNATURE

PRINT NAME

TITLE

CONTRACTOR SIGNATURE

PRINT NAME

TITLE

## ELECTRONIC PAYMENT SYSTEMS, LLC

EPS APPROVAL

PRINT NAME

TITLE

EPS APPROVAL

PRINT NAME

TITLE

# SCHEDULE A
# ATTACHMENT TO MARKETING AGREEMENT

The following is a statement of compensation.  Based on changes in CONTRACTOR EXPENSE, this program is subject to change and/or amendment from time to time in the sole and absolute discretion of EPS and as so changed and/or amended shall be incorporated by reference as if set out in full herein.  Any change and/or amendment of compensation shall not change any of the stipulations in the "Marketing Agreement." Any change in this Schedule A will become effective upon fifteen (15) day notice to Contractor.

## RESIDUAL INCOME

Provided Contractor adheres to all provisions, sections, paragraphs, covenants and material content contained in the Agreement for THIRTY-SIX(36) months from the date of this agreement including but not limited to; the Marketing Agreement, this Schedule A and the Guidelines attached and made a part of this Agreement, Contractor will be fully vested in the residual stream they have built and, Furthermore, Contractor will be vested in the ownership of provided merchants at a rate of 60% of their net value.  This is in no way a change or waiver of any rights contained in the Agreement.

Contractor shall share in listed Revenue streams provided to EPS equally, after CONTRACTOR EXPENSE are removed for the subject merchants, with a distribution rate of 60% to Contractor and 40% to EPS to the extent and duration that EPS may be held Liable.  Contractor shall indemnify EPS as provided for in the Agreement.

## INTERCHANGE PLUS PROGRAM

| Merchant Type Buy-Rate | Interchange | Card Association Assessments | Auth./Capture Settle/Host |
|---|---|---|---|
| RETAIL | 1.597% & 10 ¢  1.690% & 19 ¢ | .093% * | 9 ¢ |
| MOTO | 2.147% & 10 ¢  2.240% & 19 ¢ | .093% * | 9 ¢ |
| OFFLINE DEBIT | 1.197% & 16 ¢  1.290% & 25 ¢ | .093% * | 9 ¢ |

\*   Card Association Assessments are presented as a blended rate.  Actual Assessments are .0925% from VISA and .095% from MasterCard.  VISA volumes represent @ 2/3 of processing dollars and MasterCard represents 1/3.

## INTERCHANGE PLUS PROGRAM

## "BUY-DOWN"

The above listed Buy-Rates are based on VISA, MasterCard, Car Association, Bank, and Processor pass-through expenses. EPS understands that a competitive situation in different parts of the country may dictate pricing. EPS offers you the ability to "buy-down" the rates to maximize your efforts in your service area. The selected rate will be applied to all Merchants provided under this Agreement. Once selected, the rate option may not be changed. Review the available options carefully prior to making your selection. These are the only variations available.

By placing your initials next to the selected rates Contractor acknowledges that these rates shall be applied to all Merchants provided under this Agreement.

# SCHEDULE A
# ATTACHMENT TO MARKETING AGREEMENT

## BUY-DOWN OPTIONS

### RETAIL
### MOTO

| Interchange & Auth./Capture Settle/Host | | Auth./Capture Settle/Host | | | Interchange & |
|---|---|---|---|---|---|
| 1.70% | & | 18 ¢ | _____ | | 2.26% & |
| 18 ¢ _____ | | | | | |
| 1.69% | & | 19 ¢ | *R̄l̄* | INTERCHANGE PLUS PROGRAM LISTED ABOVE | 2.24% & |
| 19¢ _____ | | | | | |
| 1.67% | & | 20 ¢ | _____ | | 2.207% & |
| 20 ¢ _____ | | | | | |
| 1.60% | & | 21¢ | _____ | | 2.197% & |
| 21 ¢ _____ | | | | | |

## RESIDUAL INCOME SHARE BREAKDOWN

| REVENUE ITEM CONTRACTOR SHARE ABOVE NOTED EXPENSE | CONTRACTOR EXPENSE | MINIMUM CHARGE TO MERCHANT |
|---|---|---|

| | | |
|---|---|---|
| Debit Transaction<br>60% | 0.95% & 25¢ | 0.95% & 25¢ |
| Administration Fee<br>60% | $0.00 | $5.00 |
| Per Merchant Expense<br>N/A | $4.00 ** | N/A |

** Expenses here include:

| | | |
|---|---|---|
| 1 | Statement & Envelope | • Postage |
| 2 | MID/TID record retention | • Customer Service |
| 3 | Technical Support | • Imprinter Plates |
| 4 | Welcome Kits & deployment | |

| | | |
|---|---|---|
| Application Fees<br>100% | ~0~ | ~0~ |
| Batch Header Fees<br>60% | 19 ¢ | 19 ¢ |
| Download/Re-Program<br>100% | ~0~ | ~0~ |
| Excess Auth. Fees<br>60% | 19 ¢ | 19 ¢ |
| Monthly Minimum Fees<br>60% | ~0~ | ~0~ |
| Mid-Qual Downgrades<br>60% | 0.85% | 1.60% |

# SCHEDULE A
# ATTACHMENT TO MARKETING AGREEMENT

| REVENUE ITEM<br>CONTRACTOR<br>SHARE ABOVE<br>NOTED EXPENSE | CONTRACTOR<br>EXPENSE | MINIMUM<br>CHARGE<br>TO MERCHANT |
|---|---|---|
| Non-Qual Downgrades<br>60% | 1.25% | 1.75% |

| | | |
|---|---|---|
| Non-Bankcard Auth. Fees<br>60%<br>(AMEX, Discover, JCB, etc.) | 19 ¢ | 19 ¢ |
| Voice Auth Set-Up<br>60% | $2.00 (1 time fee) | $4.95 |

**ADDED VALUE SERVICES**

| | | |
|---|---|---|
| FMP Warranty Service<br>60% | ~0~ | $8.95 |
| EPS On-Line<br>60%<br>(On-Line Statements) | ~0~ | $9.95 |

| | |
|---|---|
| Check Conversion<br>"SUPPLEMENTAL CHANGE" | SEE ATTACHED SCHEDULE "A" |
| Check Guarantee<br>"SUPPLEMENTAL CHANGE" | SEE ATTACHED SCHEDULE "A" |
| EPS 90 NO CREDIT CHECK FINANCE | SEE ATTACHED SCHEDULE "B" |

Disbursement of residual income is as follows: Residual income earned in the prior calendar month will be paid on the 15th of the following month.

**AGREED AND ACCEPTED:**                                     DATE: 8-4-09

_Randell Rader_

CONTRACTOR SIGNATURE                                        EPS APPROVAL

_Randell Rader_

PRINT NAME                                                  PRINT NAME

RANDY RADER

TITLE                                                       TITLE

# SCHEDULE B
# ATTACHMENT TO MARKETING AGREEMENT

## "EPS 90 Product Offering"

The following is a statement of compensation. Based on changes in ASSOCIATED COSTS, this program is subject to change and/or amendment from time to time in the sole and absolute discretion of EPS and as so changed and/or amended shall be incorporated by reference as if set out in full herein. Any change and/or amendment of compensation shall not change any of the stipulations in the "Marketing Agreement." Any change in this Schedule B "Supplemental Change" will become effective upon fifteen (15) day notice to Contractor.

### RESIDUAL INCOME FOR IN-HOUSE FINANCING PROGRAM WITH CHECK CONVERSION AND GUARANTEE

As long as Contractor adheres and is in compliance with all of the terms and conditions of the Marketing Agreement to which this document has been attached and incorporated, and all attachments thereto, Contractor shall share in listed Revenue streams provided to EPS for this product, after ASSOCIATED COSTS are removed for the subject merchants, with a distribution rate of 50% to Contractor and 50% to EPS to the extent and duration that EPS may be held Liable. Contractor shall fully indemnify EPS as provided for in the Agreement.

| REVENUE | ASSOCIATED COSTS |
|---|---|
| IN-HOUSE FINANCE PROGRAM administration, | $4.00 per month of |
| CHECK CONVERSION WITH GUARANTEE transaction | 3.85% of volume & 15¢ per |
| SINGLE CHECK CONVERSION WITH GUARANTEE | $4.00 per month of administration, 1.00% of volume & 15¢ per transaction |

[NOTE:  Only one (1) administration fee is charge per merchant account]

Merchant must keep service for term of agreement. If merchant defaults for any reason during the initial term a charge back in the amount of the difference between the amount paid in residuals and fifty percent (50%) of the revenue received from defaulting merchant will be assessed to Contractor. Disbursement of residual income is as follows: Residual income earned in the prior calendar month will be paid on the 15th of the following month.

**AGREED AND ACCEPTED:**

_Randall Parker_

DATE :  _8 - 4 - 09_

CONTRACTOR SIGNATURE

PRINT NAME

Randy Rader

TITLE

EPS APPROVAL

PRINT NAME

TITLE

# Electronic Payment Systems, LLC
## GUIDELINES

## Sales Standards and Procedures for Independent Sales Representatives

At EPS/EPS Direct our priority is establishing long term relationships with our Merchants and Contractors. It is equally important that our Contractors establish these same types or relationships. Because the Merchants perceive Contractor as a direct extension of EPS/EPS Direct, it is imperative that Contractors comply with EPS/EPS Direct sales standards, guidelines, policies, procedures and Visa/MasterCard rules and regulations.

A violation of standards, guidelines, policies, procedures, rules and/or regulations is classified as either a TERMINATION BREACH or a PROBATION BREACH. A substantiated Termination Breach will lead to immediate termination of the Contractor. A substantiated Probation Breach will lead to the Contractor being placed on probation. The Contractor placed on probation will have thirty (30) days to remedy the breach or they will be terminated. EPS/EPS Direct, in its sole and absolute discretion, will determine if a satisfactory remedy of a breach has been achieved.

TERMINATION BREACH

❖ Misrepresentation of information on any document submitted to EPS/EPS Direct including but not limited to:

> ➢ Completing the Merchant agreement/application after the fact.
> ➢ Misleading the Merchant. Examples of such include but are not limited to: non-disclosure of all fees or stating that there are no fees, non-disclosure of surcharge for mid-qualified and/or non-qualified transactions, intentionally leaving out pertinent information, or stating and/or implying that approval by EPS/EPS Direct and/or Provider is guaranteed or unnecessary.
> ➢ Intensifying and/or falsifying information.
> ➢ Forgery.
> ➢ Altering documents.

Page 1 of 2

**EXHIBIT**

B

_____ initials

_____ initials

_____ initials

_____ initials

# Electronic Payment Systems, LLC
## GUIDELINES

## Sales Standards and Procedures for Independent Sales Representatives

---

  ➢ Falsifying, altering, or otherwise changing information including but not limited to: pictures, locations, ownership, or site survey information.
  ➢ Selling the Processing Service without submission and approval of the appropriate Application Materials.
  ➢ Presenting Merchant accounts that are known to be fraudulent in nature.

  ❖ Any indiscretion in the handling of Merchant funds is grounds for immediate termination.

PROBATION BREACH

  ❖ Receiving money from a Merchant, and not delivering agreed services.  Examples of such include but are not limited to: taking payment for equipment and not installing it, accepting programming or downloading fees and not performing such service.
  ❖ Selling equipment to Merchants that is not supported by EPS/EPS Direct.
  ❖ Using logos or trademarks associated with EPS/EPS Direct and/or Providers without prior written approval.

In order for the Agreement between EPS/EPS Direct and Contractor to remain in force, Contractor must comply with all the terms, covenants, statements, and understandings contained in the Marketing Agreement.

I have read and will comply with all the above Guidelines.

**AGREED AND ACCEPTED:**          DATE : _____

SALES REPRESENTATIVE SIGNATURE          EPS Direct APPROVAL

PRINT NAME          PRINT NAME

TITLE          TITLE

_____ initials

_____ initials

_____ initials

F:\Leo\Word docs\EPS - GUIDELINES -Updated.docx