**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-01482-MSK-CBS

RANDALL RADER,

      Plaintiff,

v.

ELECTRONIC PAYMENT SYSTEMS, LLC,

      Defendant.

---

### OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS

---

**THIS MATTER** comes before the Court pursuant to the Defendant's ("EPS") Renewed

Motion to Dismiss (**# 21**), Mr. Rader's response (**# 25**), and EPS' reply (**# 34**); and Mr. Rader's

Renewed Motion to Dismiss Counterclaims (**# 52**),[1] and EPS' response (**# 61**).

### FACTS

According to Mr. Rader's Amended Complaint (**# 18**), Mr. Rader entered into a written

contract with EPS to serve as an "independent sales representative," soliciting businesses to

purchase a "no credit check" financing product called "EPS 90" from EPS.  The EPS 90 product

is "a merchant point of sale computerized check imaging terminal linked to a point of sale

computerized payment terminal with data entry keypad connected via the internet to EPS and/or

Merrick Bank."  (In essence, the system allows merchants to offer customers up to 90 days'

delay in payment by having the customer write a check at the time of purchase, but the EPS 90

---

[1]This motion renders Mr. Rader's original Motion to Dismiss Counterclaims (**# 45**) moot.

system permits the merchant to delay the processing of that check until a specified date in the future.)  Upon making a sale to a merchant, the merchant would complete a (proposed) written Merchant Agreement with EPS on a preprinted form, and Mr. Rader would send that form to EPS, which would have the discretion to accept or reject the agreement.  If EPS accepted the agreement, the merchant would also be required to enter into a lease to obtain the physical equipment from another vendor.

In September 2009, Mr. Rader solicited a merchant called Petland to purchase the EPS 90 system for use in its 140 stores.  In October 2009, Petland obtained approval to use the EPS 90 system in two of its stores.  Petland signed off on the (proposed) Merchant Agreement, which EPS accepted, and Petland thereafter entered into the requisite lease of the physical equipment.

Mr. Rader contends that his agreement with EPS entitled him to two distinct compensation streams arising from Petland's purchase of the EPS 90 system: (i) a commission for EPS 90 system; and (ii)  "residual income" (according to a specified formula) that EPS earned from the operation of the system.  He acknowledges that through January 2010, EPS correctly compensated him for Petland's two EPS 90 systems.

In January 2010, Petland expressed satisfaction with the EPS 90 system and invited Mr. Rader to discuss potential purchase of the system for its remaining locations.  A conference call involving Petland's Director of Finance, Mr. Rader, and Greg White, EPS' Director of National Sales, was arranged for February 2, 2010.  However, Mr. White thereafter informed Mr. Rader that nothing of substance would be discussed on the February 2 conference call, and thus, Mr. Rader did not participate.  According to Mr. Rader, EPS had already communicated directly with Petland about purchasing additional EPS 90 systems,  had finalized a sale to Petland of a third

system, and that Mr. White used the conference call to encourage Petland to purchase additional systems.  During that call, the Petland representative inquired about Mr. Rader, to which Mr. White (falsely) responded "we're taking care of [him]," in order to allay the representative's concerns.

When Mr. Rader learned of these events, he sent an e-mail to Mr. White inquiring why EPS had not disclosed its dealings with Petland regarding the third system and why EPS had not paid Mr. Rader commissions relating to the third system.  Mr. White did not respond, and EPS ceased making payments of any kind to Mr. Rader as of March 2010.  Mr. Rader sent additional e-mails to Mr. White and to John Dorsey, EPS' President.  In March 2010, Mr. Dorsey responded to Mr. Rader that Petland no longer wished to work with Mr. Rader, and instead, wanted to work directly with EPS.  Mr. Rader believes those statements to be false.  Petland eventually acquired EPS 90 systems for "most if not all" of its stores, but EPS has not made any additional commission payments to Mr. Rader.  Mr. Rader contends that he has made repeated demands for payment of those commissions from EPS, but those requests have been denied.

Based on these facts, Mr. Rader alleges five claims: (i) violation of Colorado's Wholesale Sales Representatives Act, C.R.S. § 12-66-101 *et seq.*, based on EPS' failure to pay compensation due under its agreement with Mr. Rader; (ii) a claim appearing to sound in tortious interference with prospective economic advantage under Colorado law, in that EPS interfered with Mr. Rader's "ongoing business relationship with Petland"; (iii) breach of contract, in that EPS failed to pay Mr. Rader his compensation due and failed to give him 30 days notice of the (apparent) termination of their contractual arrangement; (iv) breach of the covenant of good faith and fair dealing, based on the same facts; and (v) unjust enrichment relating to the compensation

owed to him for the additional EPS 90 systems sold to Petland.

EPS filed an Amended Answer **(# 47)** asserting two counterclaims against Mr. Rader: (i) breach of contract, in that Mr. Rader breached the terms of his agreement with EPS by "seeking compensation for merchants he never solicited," particularly the additional Petland stores beyond the first two; by disclosing certain information relating to EPS' rates and other confidential information, and by "failing to provide ongoing customer support" to the merchants for which he seeks compensation; and made false representations to Petland about the terms of the EPS 90 service, among other alleged breaches; and (ii) libel, in that Mr. Rader posted disparaging statements about EPS on a website and made certain alleged false statements to a Petland representative about EPS.

Both sides now seek dismissal **(# 21, 52)** of (some of) the other sides' claims pursuant to Fed. R. Civ. P. 12(b)(6).

## ANALYSIS

### A.  Standard of review

 In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  With regard to what must be pled to avoid dismissal, the Supreme Court in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), described the standard that must be met as "facial plausibility."  In this context, "plausibility" refers to the scope and degree of specificity of the allegations in the complaint.  *Khalik v. United Air Lines*, ___ F.3d ___, 2012

WL 364058 (10th Cir. Feb. 6, 2012). Although Fed. R. Civ. P. 8(a)(2) still requires the pleader to supply only "a short and plain statement of the claim," that statement must provide more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or generalized allegations of conduct that "encompass a wide swath of conduct, much of it innocent." *Iqbal*, 129 S.Ct. at 1949. In this regard, the plaintiff must do more than articulate a set of facts that could "conceivabl[y]" or "possibly" give rise to a claim; he must "nudge[ ] his claims across the line from conceivable to plausible." *Id.* Of course, the degree of specificity that will be required will necessarily vary based on the context of the case. *Id.*

**B. EPS' motion**

EPS challenges the sufficiency of the allegations for three of Mr. Rader's claims. The Court will address each in turn.

1. Wholesale Sales Representatives Act

Colorado's Wholesale Sales Representatives Act ("WSRA"), C.R.S. § 12-66-103(1) provides that a "distributor, jobber, or manufacturer who knowingly fails to pay commissions as provided in any written contract . . . shall be liable to the wholesale sales representative in a civil action for treble the damages proved at trial." The statute does not attempt to define any of the terms it uses, nor has the Court located any published authority interpreting it.

EPS contends that the statute does not apply here because: (i) Mr. Rader is not a "representative" of EPS; (ii) the Act applies only to the sale of goods, and EPS 90 is a service, not a good; and (iii) the "sales" made by Mr. Rader were not "wholesale" sales.

The Court need not address the first two arguments,[2] as it finds clear and dispositive merit in the third.  EPS' final argument is that Mr. Rader was not engaged in "wholesale" sales. It argues that "wholesale" in this context means a sale to a reseller, middle-man, or someone other than the direct consumer of the product, and that, in the circumstances described herein, Petland was the "consumer" of the EPS 90 system.

Mr. Rader's response to this argument is somewhat indirect.  He does not appear to dispute that a sale to Petland would be a "retail," not "wholesale" sale, explaining in his brief that "[t]he bottom line is that Rader did not make any direct sale to any Petland [so] his activity therefore cannot be rationally considered retail sales."  Rather, his argument seems to take issue with the word "sales" in the phrase "retail sales": he contends that he "did not fulfill these orders [for EPS 90 systems]," and that "order acceptance or rejection [was] wholly outside plaintiff's control."

The Court finds that EPS' argument here is well-taken.  The WSRA unambiguously limits its reach to "wholesale sales."  The term "wholesale" is not statutorily defined, requiring the Court to construe it.  The fundamental rule of statutory construction is that the Court must give a statutory term its common, ordinary meaning, if such a meaning exists.  *Hassler v. Acount Brokers of Larimer County, Inc.*, 274 P.3d 547, 551 (Colo. 2012).  There is a common and ordinary meaning of the term "wholesale": *i.e.* that it is the sale of products "for resale by a

---

[2]Were the Court to address them, it would find that the use of the term "independent" to modify "wholesale sales representative" in C.R.S. § 12-66-101 would permit the conclusion that Mr. Rader could be considered a "representative" of EPS, notwithstanding EPS' arguments that his independence renders him something other than EPS' "representative."  The Court would also reject EPS' argument that the WSRA applies only to the sale of "goods," finding that every case cited by EPS in support of that argument is inapposite.

retailer, as opposed to a sale to the ultimate consumer." Black's Law Dictionary, at 1591 (7th Ed. 1999); Merriam-Webster's Collegiate Dictionary at 1346 (10th Ed. 2000) (defining "wholesale" as "the sale of commodities in quantity usu. for resale (as by a retail merchant)").

In this regard, the Court agrees with EPS that, as described in the Amended Complaint and supporting exhibits, the EPS 90 system is a product that is sold by EPS to an ultimate consumer – Petland – and not a product that Petland turns around and "resells" to its own customers. Merchants like Petland purchase the EPS 90 system as a tool that allows them to offer a different service, "No Credit Check Financing," to their customers, just as a merchant purchases a credit-card terminal to allow it to offer a different service – acceptance of credit cards – to customers. Mr. Rader's argument (in a different portion of his brief) that "the service is the in-store financing" mistakes what the product **allows** for what the product **is**. Petland's customers do not "buy" the EPS 90 system or service from Petland, and they do not acquire the computer terminals or enter into any merchant agreement with EPS. Rather, they avail themselves of a service that Petland is able to provide more effectively because it has purchased the EPS 90 system.

Accordingly, the face of the Amended Complaint reveals that Mr. Rader's sales[3] of the EPS 90 system to Petland were retail, not wholesale sales, and thus, the WSRA does not apply to those sales as a matter of law. Mr. Rader's claim under that statute is therefore dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

---

[3]To the extent Mr. Rader appears to argue that he made no "sales" whatsoever, because EPS had the ultimate decision to accept or reject a "purchase" of the system by a merchant, that argument would further defeat any contention that Mr. Rader's activities were "wholesale sales" for purposes of the WSRA.

2.  <u>Tortious Interference With Prospective Advantage</u>

Mr. Rader's second claim for relief appears to be one for tortious interference with prospective economic advantage (or prospective business relations) under Colorado law.  Part of a family of interference torts, in which each differs with respect to the precise character of the thing being interfered with (*e.g.* formation of a contract, performance of a contract, etc.), the claim derives from Section 766 and 767 of the Restatement (Second), Torts.  This section generally prohibits non-parties to a contract from intentionally and improperly interfering with an existing or expected contractual relationship.  *See generally Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1195-97 (Colo. App. 2009).

EPS argues that the claim is cognizable only where the party asserting it would have entered into the anticipated contractual relationship.  Here, EPS argues, Mr. Rader was not and could not have been a party to any contract between EPS and Petland.  In support of this contention, it relies on *MDM Group Assocs. v. CX Reinsurance Co.*, 165 P.3d 882 (Colo. App. 2007).  In *MDM*, the plaintiff insurance broker devised an insurance product that insured ski resorts against low attendance, and convinced several insurance companies to write policies of this type.  When the defendant insurer was forced to pay claims on its policy after a particularly bad skiing year, it exercised its right not to issue such policies anymore.  The plaintiff sued the defendant for tortious interference with prospective business relations, claiming that its mishandling of claims under the policy led to resorts not renewing the policies (and discouraged other recreational ventures from purchasing similar policies), thereby depriving the plaintiff of commissions.  The Colorado Court of Appeals granted judgement as a matter of law to the defendant insurer on this claim, finding that "there must be a showing of improper and

8

intentional interference by the defendant that prevents the formation of a contract between the plaintiff and a third party." *Id.* at 886.  Noting that "a defendant cannot be liable for interference with its own contract [with the plaintiff]"  the court further reasoned that the claim would not lie against a defendant "for tortious interference with **any** contract to which [it] is a party." *Id.* (emphasis in original).

Mr. Rader's response on this issue is somewhat oblique.  He argues that the "idea and actual request" for Petland to purchase EPS 90 systems for all of its stores was his own, and that "EPS did not have any relationship with Petland."[4]  Mr. Rader inverts the Amended Complaint's description of the parties' business arrangement, arguing that "EPS only fulfilled the orders Rader got from Petland,".  This ignores the allegation in the Amended Complaint that it was EPS, not Mr. Rader, that made the ultimate decision as to whether an order for an EPS 90 system was accepted or rejected.  *Docket* # 18, ¶ 25.  Thus, Mr. Rader's argument that "EPS is an outsider without any participation in this formed plan [for wide-scale purchases of EPS 90 systems by Petland] nor knowledg[e] of it" is inconsistent with the allegations in the Amended Complaint.  Although Mr. Rader may be correct in that EPS was unaware of Petland's grander intentions until Mr. Rader disclosed that fact to EPS, the "plan" was not a contract.  The contracts for purchase of services was between Petland and EPS.  Mr. Radar was not a party.

---

[4]In support of this latter contention, he cites to ¶ 34 of the Amended Complaint, which states that "In September 2009, Petland did not have EPS 90 in any Petland store or ever done business with EPS before." Mr. Rader is mixing his timeframes: EPS did not have any business relationship with Petland prior to Mr. Rader bringing about the sales of the first two EPS 90 systems, but when it came time for Petland to roll out the system to all of its stores – which is the timeframe Mr. Rader is describing in his brief – it most certainly did have an ongoing contractual relationship with EPS.

Mr. Radar's argument is further undercut by the fact that EPS **did**, in fact, enter into numerous contracts with Petland to install EPS 90 systems in many of its stores.  *Docket # 18, ¶ 68* ("most if not all Petland stores in the United States have and are using the EPS 90 system"). To the extent Mr. Rader is aggrieved by this fact, it is because those contracts were entered into between EPS and Petland directly, via Mr. White, rather than through Mr. Rader.  Mr. Radar may have a viable claim for compensation, but not upon this theory.  Mr. Rader's tortious interference claim must be dismissed for failure to state a claim.

### 3.   Unjust Enrichment

Finally, EPS argues that Mr. Rader's unjust enrichment claim is barred because the parties have an express contract covering their dealings on this point.  EPS cites to authority for the proposition that an unjust enrichment claim lies only "when the parties either have no express contract or have abrogated it."  *Citing JDB Medical*, *supra.*

This statement of the law is correct as far as it goes, but it does not apply here.  Mr. Rader contends that the unjust enrichment claim is intended to apply to commissions he should have received (and which EPS improperly retained) for events occurring after EPS' termination of its Marketing Agreement with him.  EPS argues that such claims would be cognizable under the breach of express contract claim.  The Court understands this claim to be asserted in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) and (3), in the event that his breach of contract claims were dismissed or found not to encompass the future commissions and income.  By the time of trial, Mr. Rader may be required to elect whether he intends to proceed on a contractual or unjust enrichment theory, but at the pleading stage, pleading in the alternative is permitted.

### C.  Mr. Rader's motion

Mr Rader moves to dismiss EPS' breach of contract counterclaim with regard to the allegation that Mr. Rader disclosed confidential EPS information in violation of a contractual promise not to, and moves to dismiss the libel counterclaim for both lack of personal jurisdiction and failure to state a claim.[5]

1.  Breach of contract

The crux of EPS' breach of contract claim is a single-sentence allegation at paragraph 13, reading: "Plaintiff breached his duty to keep defendant's rates and other information confidential by filing his complaint with the parties' Marketing Agreement, including the applicable rates, attached and not under seal."  Mr. Rader argues that, to the extent this is alleged to be a standalone claim for breach of contract, the claim fails because EPS has not pled sufficient facts to demonstrate that the information in question is subject to confidentiality protection as a trade secret under Colorado law.

EPS responds that the claim is not one sounding in confidentiality arising from the information's status as a trade secret, but rather, that the claim is asserting a simple breach of contract: that Mr. Rader promised not to reveal certain information belong to EPS (whether that information constitutes a trade secret or not), and that Mr. Rader nevertheless did so.  Mr. Rader did not file a reply addressing this contention.

The Court will not attempt to parse this claim beyond its facial contours.  EPS has alleged

---

[5]Mr. Rader makes a perfunctory argument that EPS also failed to plead its own compliance with its contract with Mr. Rader as an element of the breach of contract claim.  The Court finds that EPS' contention that it performed its obligations under the agreement can be reasonably inferred from the statement of counterclaims.

that a contract exists between it and Mr. Rader, that the contract prohibits Mr. Rader from publicly disclosing information relating to EPS' rates, and that Mr. Rader nevertheless did so. Although the claim appears to be beset by a host of conceptual problems,[6] it facially pleads a colorable breach of contract claim. Whether the claim can ultimately survive scrutiny at the summary judgment stage is a matter the Court does not address at this time.

2. <u>Libel</u>

EPS' libel counterclaim relates to two statements by Mr. Rader: (i) a website posting made by Mr. Rader's counsel on a website known as "ripoff report.com"; and (ii) an e-mail message sent by Mr. Rader's counsel to Linda Johnson, Petland's Director of Finance. The Counterclaim does not quote, much less describe, the alleged defamatory statements.

Mr. Rader moves to dismiss the libel counterclaims on several grounds, including the Court's lack of personal jurisdiction over him for events occurring outside of Colorado and for failure to state a claim. The Court need not address the first argument because it finds merit in the second.

To state a claim for libel under Colorado law, EPS must allege facts showing: (i) Mr. Rader made a defamatory statement about EPS; (ii) that he published that statement to a third party; (iii) that he acted with a sufficiently culpable state of mind; and (iv) the statement is actionable either due to EPS suffering special damages or the statement being inherently actionable even without such damages. *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 961

---

[6]The Court has profound doubts that, even if EPS successfully proves this claim, it can recover any damages, insofar as EPS never filed its own motion to restrict access to the allegedly confidential information filed by Mr. Rader. Moreover, the Court has some doubt as to whether a contract that purportedly operates to prohibit a party from disclosing arguably relevant information to the Court as part of a judicial proceeding would be void as against public policy.

(Colo. App. 2009).  To be defamatory, a statement must be one that "holds an individual up to contempt or ridicule" and that "prejudice[s] the plaintiff in the eyes of a substantial and respectable minority of the community." *Wilson v. Meyer*, 126 P.3d 276, 279 (Colo. App. 2005). A defamatory statement must be one of fact; a statement of opinion is not actionable.  *Id.* at 280; *but see Air Wisconsin Airlines Corp. v. Hoeper*, ___ P.3d ___, 2012 WL 907764 (Colo. Mar. 19, 2012) (slip op.), *citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (statement of opinion that implied an assertion of objective fact can be defamatory).  And, of course, it goes without saying that to be defamatory, a statement must be provably and materially false; minor or irrelevant inaccuracies, much less outright truth, will not support a claim for libel.  *McIntyre v. Jones*, 194 P.3d 519, 528 (Colo. App. 2008).

EPS' Counterclaim is curious in several respects.  With regard to the statement posted on "ripoff report.com," EPS does not quote or describe the offending statement in any meaningful way.  To the extent it offers any insight whatsoever into the subject matter of the statement, EPS concedes that the statement "is accurate and simply references the pending lawsuit."

 In the absence of a clear description (preferably an outright quotation) of the allegedly defamatory statement, EPS has not plead a "plausible" libel claim under the pleading standards set out in *Iqbal*.  The allegation that a particular statement is "defamatory" is nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Without giving the Court some ability to assess whether the standard is indeed potentially defamatory – *e.g.* whether it is a statement of fact or opinion, or whether it is provably false – EPS has done nothing more than offer generalized allegations of conduct that "encompass a wide swath of conduct, much of it innocent."  *Iqbal*, 129 S.Ct. at 1949.  Accordingly, EPS' libel claim as

premised on the statement made by Mr. Rader's attorney to "ripoff report.com" is dismissed for failure to state a claim.

The allegedly defamatory statement made by Mr. Rader's counsel to Ms. Johnson suffers from the same deficiencies. The Counterclaim states only that the statement "indicat[ed] . . . that EPS' President, Mr. Dorsey, had made false statements regarding Petland." Once again, the Court finds this allegation to be insufficiently conclusory to permit the claim to proceed under Rule 12(b)(6). Without some more explicit description of the statement, the Court would have to simply accept EPS' conclusion that the statement did indeed squarely accuse Mr. Dorsey of making false statements and that it was actionable as a statement of provable fact, rather than a statement of opinion. Under *Iqbal*, pleadings such as this that offer nothing more than conclusions are insufficient to survive dismissal under Rule 12(b)(6).[7]

These defects are, arguably, curable by amendment. Typically, the Court freely grants leave to parties to amend pleadings. Fed. R. Civ. P. 15(a). However, here, the parties' Scheduling Order (**# 16**) set a deadline of October 2011 for amendment of pleadings, a date that has long since passed without any request to amend. Moreover, the record reflects that EPS has already amended its original Counterclaim (**# 43**) in response to a motion to dismiss (**# 45**) by Mr. Rader that specifically raised insufficient pleading as one of its contentions. Thus, one might conclude that EPS has already attempted to plead its libel counterclaim to the best of its ability, such that leave to replead is unnecessary. However, rather than reflexively grant EPS leave to replead the libel counterclaim, the Court will dismiss that counterclaim without prejudice. If EPS

---

[7] The Court further notes that although EPS alleges that it suffered "special damages" as a result of Mr. Rader's statement to Ms. Johnson, it does not plead those damages with the degree of specificity required by Fed. R. Civ. P. 9(g).

believes that it can replead its claim to cure the defects, it may file an appropriate motion seeking leave to do so within 10 days.  That motion shall, at a minimum, include the text of a proposed counterclaim that sufficiently pleads a cognizable libel claim.  The motion shall also demonstrate good cause for amending the Scheduling Order to permit an untimely amendment of the pleadings.

## <u>CONCLUSION</u>

For the foregoing reasons, EPS' Renewed Motion to Dismiss **(# 21)** is **GRANTED IN PART**, insofar as the Court **DISMISSES** Mr. Rader's first claim for relief, sounding in violation of the Wholesale Sales Representatives Act, and second claim for relief, sounding in tortious interference with prospective business advantage, and **DENIED IN PART**, insofar as the Court refuses to dismiss Mr. Rader's fifth claim for relief, sounding in unjust enrichment. Mr. Rader's Renewed Motion to Dismiss Counterclaims **(# 52)** is **GRANTED IN PART**, insofar as EPS' second counterclaim, sounding in libel, is **DISMISSED** without prejudice, with EPS granted 10 days from the date of this Order to file a motion seeking leave to replead that counterclaim, and **DENIED IN PART**, insofar as the Court finds that EPS' first counterclaim, sounding in breach

of contract for Mr. Rader's disclosure of confidential information, facially states a claim. Mr. Rader's original Motion to Dismiss Counterclaims (**# 45**) is **DENIED AS MOOT.**

Dated this 21st day of September, 2012

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

16